IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **MDJ AVIATION, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:19-cv-00321-P |
| | § | |
| **UNIFLIGHT, LLC et al.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff MDJ Aviation, LLC's Motion for Summary Judgment (ECF No. 29), Defendant Uniflight, LLC's Motion for Summary Judgment (ECF No. 26), the respective responses, and the respective replies. Having considered the motions, briefing, and applicable law, the Court finds that summary judgment should be and hereby is **GRANTED** in favor of Uniflight and **DENIED** as to MDJ Aviation. Accordingly, MDJ Aviation's claims are hereby **DISMISSED with prejudice.**

## UNDISPUTED FACTS

It is undisputed that MDJ Aviation leased the premises at 2617 and 2621 Aviation Parkway, Grand Prairie, Texas 75052 ("the Premises") to Uniflight pursuant to the lease ("the Lease") that is the subject of this lawsuit. On or about January 7, 2019, Uniflight informed MDJ Aviation that there was roof damage to the Premises that would require repair. Pl.'s MSJ Br. at 8, ECF No. 29. MDJ Aviation submitted a claim to the insurance company they used to insure the Premises and had the roof repaired. *Id.* at 9. The out-of-pocket cost to MDJ Aviation was $97,358.34. *Id.*

Relying on different sections of the Lease, the parties assert that the other must pay the $97,358.34 for the roof repairs. The sole issue the Court resolves is who is required to pay for the roof repairs under the terms of the Lease. The pertinent sections of the Lease are outlined below.

**A.      Section 1.09: Expense Reimbursements**

Section 1.09A of the Lease establishes the costs for which Uniflight must reimburse MDJ Aviation in relation to the Premises which Uniflight must pay as additional rent in the form of an expense reimbursement. The parties checked two boxes indicating Uniflight is responsible for Real Estate Taxes and Insurance Premiums but did not check the box corresponding to Roof and Structural Maintenance Expenses. *Id.* A screenshot of this portion of the Lease is shown below.

> 1.09    Expense Reimbursements:
>
> A. Tenant shall pay Landlord as additional Rent (or pay the charges directly to the service provider, if applicable) the following expenses (or a portion of the expenses, if applicable) (each an "Expense Reimbursement" and collectively the "Expense Reimbursements") that are incurred by or assessed against the Premises (as each of these terms is defined in this Lease) *[check all boxes that apply]*:
>
> ☑ Real Estate Taxes;
> ☑ Insurance Premiums;
> ☐ Common Area Maintenance (CAM) Expenses;
> ☐ Operating Expenses;
> ☐ Roof and Structural Maintenance Expenses;
> ☐ Electricity;
>
> LANDLORD'S INITIALS _____   TENANT'S INITIALS _____
> COMMERCIAL LEASE AGREEMENT– PRODUCED WITH WINAIR FORMS ©                    Page 3
> ©NTCAR 2014 – FORM NO. 2 (3/2014)

Pl.'s MSJ App. at 131, ECF No. 30.

Section 1.09B defines "Real Estate Taxes" as "all general real estate taxes, ad valorem taxes, general and special assessments, parking surcharges, rent taxes, and other

2

similar governmental charges levied against or applicable to the Property for each calendar year." *Id.* at 132. This section also defines "Insurance Premiums" as all "Landlord's insurance premiums attributable to the Property, including but not limited to insurance for fire, casualty, general liability, property damage, medical expenses, extended coverage, and loss of rents coverage for up to 12 months' Rent." *Id.* "Roof and Structural Maintenance Expenses" are defined as "all costs of maintenance, repair and replacement of the roof, roof deck, flashings, skylights, foundation, floor slabs, structural components and the structural soundness of the building in general." *Id.*

Section 1.09C establishes the method of payment that Uniflight must use in reimbursing MDJ Aviation. The section reads as such:

> C. **Expense Reimbursement Limitations.** The amount of Tenant's Expense Reimbursement will be determined by one of the following methods as described and defined below *[check only one]:*
>
> ☐ Base Year Adjustment;
> ☐ Expense Stop Adjustment;
> ☒ Pro Rata Adjustment;
> ☐ Fixed Amounts; or
> ☐ Net Lease.
>
> D. **Expense Reimbursement Limitation Definitions.**

*Id.* at 133.

Section 1.09D defines "Pro Rata Adjustment" and states that if that box is checked, "Tenant shall pay to the Landlord as additional Rent Tenant's Pro Rata Share of the total amount of the applicable expenses (those checked in Section 1.09.A above) for every calendar year during the Term and during any extension of this Lease. *Id.* "Net Lease" is also defined and states that if Net Lease is checked above, "then notwithstanding anything contained in this Lease to the contrary in Section 6.02, Article Seven, or otherwise, Tenant

3

shall be responsible for paying Tenant's Pro Rata Share of all costs of compliance with laws, ownership, maintenance, repairs, replacements, operation of the Premises, and operation of the Property, including but not limited to all costs of Real Estate Taxes, Insurance Premiums, Common Area Maintenance Expenses, Operating Expenses, Roof and Structural Maintenance Expenses, and all Utilities (regardless of whether they have been checked in Section 1.09.A. above)." *Id.* at 134.

> Finally, Section 1.09 closes with a general "net lease" provision that reads as such:
>
> Except as otherwise provided in this Lease to the contrary with respect to Tenant's obligation to reimburse Landlord for Real Estate Taxes and Insurance Premiums, it is understood and agreed that this is a "net" Lease, and that all Rent and charges due hereunder shall be absolutely net to the Landlord throughout the Term, and the Landlord shall not be required to perform any services or furnish any utilities of any kind or nature. All costs, expenses and obligation of any kind relating to the Premises and the maintenance, occupancy, and operation thereof, whether or not specifically identified in this Lease, unless specifically stated herein to be the responsibility of the Landlord, shall be paid directly by the Tenant.

*Id.* at 135.

**B.      Section 5.01: Property Insurance**

Section 5.01 establishes that during the Term of the lease, MDJ Aviation "shall maintain insurance policies covering damage to the Premises in an amount equal to the full replacement cost thereof. The policies will provide protection against all insurable hazards, risks and causes of loss under commercially available insurance." Pl.'s MSJ App. at 139.

**C.      Section 7.03: Maintenance and Repairs**

    1.      <u>Subpart A: Landlord Obligations</u>

Section 7.03A establishes MDJ Aviation's obligations under the Lease in repairing and maintaining the Premises. This section states the following:

> Subject to the provisions of Article Eight (Damage or Destruction) and Article Nine (Condemnation) and except for damage caused by any intentional misconduct, or negligent act or omission of Landlord, Landlord shall not keep the roof, skylights, foundation, structural components and the structural portions of the exterior walls of the Premises in good order, condition and repair. . . In addition, Landlord will not be obligated to make any repairs under this Section until a reasonable time after receipt of written notice from Tenant of the need for repairs. If any repairs are required to be made by Landlord, Tenant shall, at Tenant's sole cost and expense, promptly remove Tenant's furnishings, fixtures, inventory, equipment and other property, to the extent required to enable Landlord to make repairs. Landlord' liability under this Section will be limited to the cost of those repairs or corrections…

Pl.'s MSJ App. at 143.

    2.      <u>Subpart B: Tenant's Obligations</u>

Section 7.03B establishes Uniflight's obligations under the Lease in repairing and maintaining the Premises. The section states the following:

> Subject to the provisions of Section 7.01, Section 7.03A, Article Eight (Damage or Destruction) and Article Nine (Condemnation), Tenant shall, at all times, keep all other portions of the Premises in good order, condition and repair (except for normal wear and tear), including, but not limited to, maintenance, repairs and all necessary replacements of the roof, skylights, foundation, structural components, and the structural portions of exterior walls, windows, plate glass, doors, overhead doors, HVAC equipment, electrical and lighting systems, fire protection sprinkler system, interior and exterior plumbing, the interior and exterior of the Premises in general, pest control and extermination, down spouts, gutters, paving, care of landscaping and regular mowing of grass. In addition, Tenant shall, at Tenant's expense, repair any damage to any portion of the Property, including the roof, skylights, foundation, or structural components and exterior walls of the

5

Premises, caused by Tenant's acts or omissions. If Tenant fails to maintain and repair the Property as required by this Section, Landlord may, on 10 days' prior written notice, enter the Premises and perform the maintenance or repair on behalf of Tenant, except that no notice is required in case of emergency, and Tenant shall reimburse Landlord immediately upon demand for all costs incurred in performing the maintenance or repair, plus a reasonable service charge.

*Id.*

**D.     Article Eight: Damage or Destruction**

Article Eight establishes the protocol for handling damage or destruction of the Premises. Section 8.01 states that if any buildings or improvements on the property are damaged by a windstorm, tornado, or other casualty, then "Tenant shall promptly give written notice of the damage or destruction to Landlord." Pl.'s MSJ App. at 145. Section 8.02 then states that if these kinds of damages happen, "and rebuilding and repairs can be completed within 120 days after the date Landlord receives written notification from Tenant. . . Landlord shall proceed with reasonable diligence to rebuild and repair the Premises. . . to substantially the condition they were in before the damage." *Id.*[1]

## LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts

---

[1] Because neither party contends that the Lease is Ambiguous and the Court agrees that the contract is unambiguous, the Court omits any additional facts in this section detailing contract negotiations or conversations that may go to the parties' intent. *See Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 121 (Tex. App.—Corpus Christi 1999, pet. denied) (holding that when parties disagree about the meaning of an unambiguous contract, the court must ascertain the parties intent by looking at the agreement alone, with no other representations).

6

are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine dispute as to any material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c).

When reviewing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250. "On cross-motions for summary judgment, the court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Target Constr., Inc. v. Baker Pile Driving & Site Work, LLC*, No. 12-01820, 2013 WL 4721369, at *2 (E.D. La. Sept. 3, 2013) (citing *Ford Motor Co. v. Tex. Dep't of Transp.,* 264 F.3d 493, 498 (5th Cir. 2001)).

## ANALYSIS

MDJ Aviation brought this civil action seeking damages for a breach of contract claim or a declaratory judgment that Uniflight is responsible for maintaining the roof and must therefore reimburse MDJ Aviation for the costs of the completed roof repair and

attorneys' fees. *See* Compl. at 6–7, ECF No. 1. Unflight, in response, filed an answer and counterclaim also seeking damages for breach of contract or declaratory judgment that MDJ Aviation is responsible for paying for repairs to the roof and attorneys' fees. Def.'s Answer at 4–6, ECF No. 10. The Parties, in their cross-motions for summary judgment, have whittled this case down to one determinative issue: who, under the Lease, is responsible for the $97,358.34 that MDJ Aviation paid out-of-pocket for repairing the storm damage to the roof of the Premises?

MDJ Aviation relies on the final paragraph in Section 1.09 and argues that this is an absolute net lease with all costs and money going to MDJ Aviation. Pl.'s MSJ Br. at 14. MDJ Aviation also points to Article Eight, which it claims establishes that MDJ Aviation is responsible for coordinating the repairs through insurance claims but does not require MDJ Aviation to pay for the repairs. *Id.* Uniflight counters that Article Eight does require MDJ Aviation to pay for the repairs and that the provisions in Article Seven and Section 1.09 include qualifying language like "except as otherwise provided by the lease" that render MDJ Aviation's argument fruitless. Def.'s MSJ Br. at 7–9, ECF No. 27. The Court agrees with Uniflight that MDJ Aviation is responsible for the costs of the roof repair but finds this in its own reading of the Lease, specifically Section 1.09, not Article 8.

As noted above, there is no contention that the Lease is ambiguous, and the Court finds that the Lease is unambiguous. When parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent by examining and considering the entire writing in an effort to give effect to the parties' intentions as expressed in the contract. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).; *First City*

*Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 136 (Tex. App.—El Paso 1991, no writ); *KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex. App.—Houston [1st Dist.] 1987, writ denied); *cf. Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 332 (1827) (Marshall, C.J. dissenting) ("To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers;—is to repeat what has been already said more at large, and is all that can be necessary."). The intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981); *cf. Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 202 (1819) (Marshall, C.J.) ("It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation.").

MDJ Aviation correctly brings to light three rules of contractual interpretation: "(1) specific provisions control over general provisions; (2) provisions stated earlier in an agreement are favored over subsequent provisions; and (3) the interpretation of an agreement should not render any material terms meaningless." Pl.'s MSJ Br. at 16, ECF No. 29 (citing *Sefzik v. Mady Dec., L.P.*, 231 S.W.3d 456, 462 (Tex. App.—Dallas 2007, no pet.). With regards to what provisions are stated earliest, Section 1.09 is clearly the first section that provides direction on this issue, giving it more weight in the Court's analysis.

9

Also, the Court finds that Section 1.09 is more specific than other portions of the Lease as it directly addresses the issue of what Uniflight is responsible for monetarily. Section 1.09 gave the Parties the opportunity to check a box that would require Uniflight to pay for "Roof and Structural Maintenance Expenses," as well as a box that would render this lease a "Net Lease," but both of these boxes were left unchecked. Pl.'s MSJ App. at 131–133. Conversely, the Parties intentionally checked three other boxes. *Id.* MDJ Aviation relies on the catch-all provision at the end of Section 1.09 to prove that this is a net lease and that regardless of what boxes were or were not checked, any money spent by MDJ Aviation should be reimbursed by Uniflight. The Court does not find that this catch-all paragraph is sufficient to overcome the more specific provisions that come before.

The Court also notes that Section 1.09 is the only section in this Lease that establishes responsibility for expenses. Articles Five, Seven, and Eight discuss different responsibilities and the instructions for the Parties as to the proper methods for handling damage to the Premises, but none of the three articles discuss who bears the costs. Section 7.03 does mention that should MDJ Aviation have to make any repairs, Uniflight, at its own cost, would be responsible for moving their possessions out of the way and that if Uniflight were to cause any damage it would be responsible for paying for the repairs, but these are exceptions to the provisions established in 1.09. *See* Pl.'s MSJ App. at 143. Because Section 1.09 clearly establishes the costs that Uniflight is responsible for under the Lease, and roof maintenance is not one of them, the Court finds that Uniflight is not responsible for the repairs to the roof and is not required to reimburse MDJ Aviation.

## ATTORNEY'S FEES

Both parties seek to recover their attorney's fees incurred as a result of this litigation. The parties are **ORDERED** to file the appropriate motions and briefing on this issue **on or before May 6, 2020.** Following the appropriate motion(s), non-movants will have **14 days to respond**, and movants will subsequently have **7 days to reply.**

## CONCLUSION

Because Uniflight is not responsible for reimbursing MDJ Aviation for the roof repairs under the Lease, the Court finds that MDJ Aviation's Motion for Summary Judgment should be and hereby is **DENIED** and Uniflight's Motion for Summary Judgment should be and hereby is **GRANTED.** Accordingly, MDJ Aviation's claims are hereby **DISMISSED with prejudice.**

**SO ORDERED** on this **22nd day** of **April**, **2020.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE